ORDERED.

Dated:  July 08, 2016

Jerry A. Funk
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

                                                        **Case No.: 3:14-bk-6094-JAF**

**LARRY JAMES ALLEN,**

       **Debtor.**

_____/

**PAYROLLING PARTNERS, INC.,**

       **Plaintiff,**

v.                                                   **Adv. No.: 3:15-ap-71-JAF**

**LARRY JAMES ALLEN,**

       **Defendant.**

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       This proceeding came before the Court upon a Complaint Objecting to Discharge (the "Complaint") (Doc. 1).[1]  Count I of the Complaint is an objection to Defendant's discharge pursuant to 11 U.S.C. § 727(a)(2).  Count II of the Complaint is an objection to Defendant's discharge pursuant to 11 U.S.C. § 727(a)(3).  Count III of the Complaint is

---

[1] Plaintiff is a creditor of Defendant by virtue of a judgment entered on December 16, 2014 in the Circuit Court of Duval County, Florida in the amount of $228,867.54.

an objection to Defendant's discharge pursuant to 11 U.S.C. § 727(a)(4).  The Court held a trial on March 10, 2016.  Thereafter, in lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions.  Upon the evidence and the applicable law, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

On December 18, 2014, Defendant filed this Chapter 7 bankruptcy petition.  Prior to February, 2000, Defendant was employed by Allstate Insurance Company ("Allstate") as an insurance agent for 32 years.  In February of 2000, Defendant converted from an employee of Allstate to an independent contractor for Allstate.  (Pl.'s Ex. 1).  As an insurance agent, Defendant's remuneration came in the form of commissions.  When Defendant sold an insurance policy, he received a commission at that time.  In addition, if the customers to whom Defendant sold policies renewed their policies in subsequent years, Defendant received renewal commissions for the renewal periods.  Although Defendant sold insurance primarily through Allstate, he also sold homeowners policies through other companies.

On March 10, 2014, Allstate delivered a letter dated February 25, 2014 to Defendant informing him that it was terminating its relationship with him effective June 1, 2014.  (Pl.'s Ex. 41).  Defendant had the option of receiving termination buyout payments from Allstate or selling his Allstate business to another agent.  Defendant opted to take the termination buyout payments which were to be paid at $2,190.43 per month for twenty four months.

On July 1, 2014, Allstate terminated its relationship with Defendant.  (Def.'s Ex. 10).  On August 12, 2014, Defendant established Allen Insurance Corporation, with an effective date of August 5, 2014.  (Pl.'s Ex. 42).  In September of 2014, Defendant began

receiving the termination buyout payments.  (Def.'s Ex. 24).  Defendant conceded that he performed no post-petition services to receive the termination buyout payments.  Because the termination buyout payments were paid in lieu of renewals, Defendant was not paid for renewals for Allstate policies after his contract with Allstate was terminated.  However, Defendant continued to be paid for renewals associated with homeowners policies he wrote through other companies.

Defendant indicated on Item 2 of Schedule B of his bankruptcy petition that he owned a checking account at Wells Fargo Bank, a checking account at Duco Federal Credit Union, a checking account and savings account at Jax Federal Credit Union, and a business checking account at Suntrust Bank.  (Pl.'s Ex. 3).  In response to Item 28 of Schedule B, which requires a debtor to list office equipment, furnishings, and supplies, Defendant listed three computers, three desks and chairs, and a filing cabinet valued at a total of $300.00. (Id).

Schedule I is entitled "Your Income".  Part 1 of the form requires a debtor to describe his employment.  Part 2 of the form requires a debtor to provide details about his monthly income.  Part 2 states "[e]stimate monthly income as of the date you file this form." On Schedule I of his bankruptcy petition, Defendant indicated that he was self-employed as an insurance agent and had been so employed for 43 years.  (Pl.'s Ex. 3).  On line 8a of schedule I, which requires a debtor to list net monthly income from operating a business, Defendant listed $432.74.  (Id.)  Defendant did not list any other income on his Schedule I. (Id.)  Matt Wolfe, Defendant's bankruptcy attorney, testified that it is his practice when he represents a Chapter 7 debtor engaged in a business to have the debtor complete the same profit and loss statements required by the Chapter 13 trustee in Chapter 13 cases.

Defendant's profit and loss statement for the month of November, 2014 indicates he had gross business income of $2,389.39[2] and total business expenses of $1,965.65 resulting in total net income of $423.74, the approximate amount that was listed on Defendant's Schedule I.[3]  (Def.'s Ex. 4).  Defendant indicated on Schedule J that his monthly expenses were $3,326.19 resulting in a negative net monthly income of $2,893.45.  (Pl.'s Ex. 3). Defendant's profit and loss statement for the month of October, 2014 indicated total gross income of $2,279.43 and his profit and loss statement for the month of September, 2014 indicated total gross income of $3,957.72.

Although the gross business income on the profit and loss statements included the termination buyout payments, Defendant's schedules did not list the payments as an asset. At the time Mr. Wolfe filed the bankruptcy petition on behalf of Defendant, he understood there was a termination agreement and a non-compete clause.  However, Mr. Wolfe testified he was not provided a copy of the termination agreement or the contract with Allstate until a year after the filing of the case and that his understanding of the payment at the time the case was filed is different than his current understanding.

The Chapter 7 Trustee conducted a telephone interview with Defendant prior to the 341 meeting of creditors.  Mr. Wolfe was a party to the conversation through a conference call.  Mr. Wolfe testified that he discussed the termination buyout payments with the Trustee.  At the January 22, 2015 meeting of creditors, the Trustee brought up the issue of the termination buyout payments and Defendant explained the nature of the payments. Plaintiff's attorney was present at the meeting of creditors.  On that same day, Defendant

---

[2] This amount was obtained from Defendant's November, 2014 Wells Fargo bank statement and represents the sum of the $2,190.43 November termination buyout payment and a $198.98 payment from Southern Fidelity, one of the insurance companies from whom Defendant received renewal commissions.

[3] When Mr. Wolfe completed the Schedule I, he transposed the numbers 2 and 3 in $423.74 and therefore listed $432.74 on the Schedule I.

filed an Amended Schedule I. (Def.'s Ex. 3). In response to question 13 on the Amended Schedule I, which asks whether the debtor expects an increase or decrease in income within the year after he files the form, Defendant answered no and explained "[the] [v]ast [m]ajority of [Defendant]'s income is derived from his termination as an Allstate agent and the payout of his referrals on his existing book of business over a 2 year period." (Id.)

Defendant did not list an interest in Allen Insurance Corporation on his Schedule B. However, Defendant listed it on the Statement of Financial Affairs (the "SOFA"), in response to Item 18, which requires a debtor to list all businesses with which he was affiliated within the six years preceding the petition. (Pl.'s Ex. 4).

In response to questioning by the Trustee at the telephone conference, Defendant disclosed that during the year preceding the filing of his bankruptcy, he sold a 2003 Ford Expedition to his son for approximately $1,500.00-$2,000.00. However, the sale was not listed on item 10 of Defendant's SOFA, which requires the disclosure of such a transfer. Mr. Wolfe testified that Defendant disclosed the transfer to him but that he failed to list it on the SOFA.

On February 27, 2015, Plaintiff filed this adversary proceeding. On March 17, 2015, Plaintiff served a Request to Produce upon Defendant. (Pl.'s Ex. 5). Paragraph 2 of the Request to Produce requested that Defendant produce all W-2s and 1099s issued to him for the tax year 2011 to March 17, 2015. (Id.) Paragraph 15 of the Request to Produce requested that Defendant produce "[a]ny and all bank statements, canceled checks or other memoranda showing or tending to show all transactions with any bank or banks with which Defendant did business from January 1, 2011 to [March 17, 2015]." (Id.) Paragraph 20 of the Request to Produce requested that Defendant produce all "personal and business bank

account statements for any account referenced [in] Schedule B of your bankruptcy schedules, together with all cancelled checks from January 1, 2011 through January 31, 2015." (Id.)

Defendant produced bank statements for the Wells Fargo checking account for 2012, 2013, and 2014 but did not produce statements for any of the other four accounts. Defendant offered no explanation as to why he did not produce any statements for the other four accounts. Defendant produced copies of his 2011-2013 federal income tax returns and the accompanying 1099s. Defendant's 2013 income tax return and his 2013 1099 income statements indicate he earned $62,584.39 from Allstate and $17,594.18 from 8 other insurance companies for total gross receipts of $80,178.57. (Def.'s Ex. 6). However, the 2013 Wells Fargo bank statements only reflect deposits from Allstate and one other insurance company. (Pl.'s Ex. 8). The deposits into the Wells Fargo account total $68,295.13, $11,883.44 less than the $80,178.57 in receipts reflected on Defendant's tax return. (Id.) Defendant offered no explanation as to the disposition of the remaining $11,883.44.

Defendant did not produce a copy of his 2014 federal income tax return. The only 2014 1099 income statement Defendant produced was from Allstate. (Def.'s Ex. 5). At the trial of this matter, Defendant testified that he still had not filed his 2014 tax return because the Internal Revenue Service informed him he was a victim of identity theft and instructed him not to file the return. Defendant offered no reason as to why he failed to produce the remaining 2014 1099s.

## Conclusions of Law

"In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets." Schultz v. U.S., 529 F.3d 343, 346 (6th Cir. 2008). The Bankruptcy Code favors discharge of the honest debtor's debts and provisions denying a debtor's discharge are construed liberally in favor of the debtor and strictly against the creditor. Cohen v. McElroy (In re McElroy), 229 B.R. 483, 487 (Bankr. M.D. Fla. 1998). However, there are limitations on the right to a bankruptcy discharge. Id. "Section 727 … provides that a debtor shall be granted a discharge unless one or more of twelve enumerated reasons to deny the discharge exists." Menotte v. Hahn (In re Hahn), 362 B.R. 542, 546 (Bankr. S.D. Fla. 2007). Plaintiff seeks to have the Court deny Defendant's discharge pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4).

### 11 U.S.C. § 727(a)(2)

Plaintiff asserts that Defendant fraudulently undervalued assets, fraudulently failed to disclose a pre-petition transfer, and fraudulently omitted certain assets on his bankruptcy schedules and his discharge should therefore be denied pursuant to 11 U.S.C. § 727(a)(2)(A).[4] Section 727(a)(2) provides that the court shall not grant a discharge if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
> **(A)** property of the debtor, within one year before the date of the filing of the petition; or
> **(B)** property of the estate, after the date of the filing of the petition;

---

[4] It appears Plaintiff intends to refer to § 727(a)(2)(B).

11 U.S.C. § 727(a)(2).   Several courts hold that the fraudulent failure to schedule assets constitutes fraudulent concealment under § 727(a)(2)(B).   In re Burke, 523 B.R. 765, 770 (Bankr. E.D. Penn. 2015).   "Such purposeful conduct would appear to fall literally within the terms of 11 U.S.C. § 727(a)(2)(B) as a concealment 'of property of the estate, after the date of the filing of the petition'-at least if the schedules are filed after the petition." Id.   Other courts hold that such claims should be raised under § 727(a)(4).   Id.   The Court is of the opinion that claims that a debtor fraudulently undervalued assets, fraudulently failed to disclose pre-petition transfers, or fraudulently failed to schedule assets should be raised under  § 727(a)(4).   Accordingly, the Court will not deny Defendant's discharge pursuant to § 727(a)(2) and will address the allegations set forth in Count I in its discussion of Count III.

### **11 U.S.C. § 727(a)(3)**

Plaintiff asserts that Defendant failed to keep adequate books and records from which his financial condition could be ascertained and did not explain or justify such failure under the circumstances of this case.   Plaintiff seeks the denial of Defendant's discharge pursuant to 11 U.S.C. § 727(a)(3) which provides that the court shall not grant a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

11 U.S.C. § 727(a)(3).   "The purpose of § 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of a debtor's affairs and to

test the completeness of the disclosure requisite to a discharge … The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." <u>Meridian Bank v. Alten (In re Alten)</u>, 958 F.2d 1226, 1230 (3d Cir. 1992).  "Creditors are not required to risk having the debtor withhold or conceal assets 'under cover of a chaotic or incomplete set of books or records.'"  <u>Id.</u> (quoting <u>In re Cox</u>, 904 F.2d 1399, 1401 (9th Cir. 1990)).  "[C]ourts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs."  <u>Buckeye Ret. Props. v. Tauber (In re Tauber)</u>, 349 B.R. 540, 548 (Bankr. N.D. Ind. 2006).

A creditor objecting to a discharge under § 727(a)(3) has the initial burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions."  <u>Meridian Bank</u>, 958 F.2d at 1232.  Once a creditor shows that a debtor's records are inadequate, the burden shifts to the debtor to justify such inadequacies. <u>Id.</u> at 1233.  A debtor's failure to produce adequate books and records from which his financial condition can be ascertained creates an inference that the debtor concealed, destroyed, mutilated, falsified, or failed to keep or preserve the records.  <u>In re Buzzelli</u>, 246 B.R. 75, 100-101 (Bankr. W.D. Penn. 2000).

The Court finds that Defendant failed to keep adequate books and records from which his financial condition could be ascertained and did not explain or justify such failure under the circumstances of this case.  Despite having been requested to produce all of his bank statements from January 1, 2011 to March 17, 2015, Defendant failed to produce anything other than the 2012-2014 Wells Fargo statements.  Based upon the

gross receipts of $80,178.57 reflected on Defendant's 2013 tax return and deposits into the Wells Fargo account of only $68,295.13, Defendant's creditors and the Court are left to wonder as to the disposition of almost $12,000.00. With respect to 2014, because Defendant failed to produce his 1099 statements (other than the Allstate statement) and failed to produce his bank statements (other than the Wells Fargo statements), Defendant's creditors and the Court have no way to determine what amounts Defendant received from the various sources from whom he receives income and the disposition of those funds. The Court is not suggesting that Defendant disposed of the income, however much that was, in an improper way.  However, the price of a Chapter 7 discharge is complete and utter transparency.  The Court and creditors should not be required to guess or speculate as to a debtor's income and expenditures.  Accordingly, the Court will deny Defendant's discharge pursuant to § 727(a)(3).

### 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A)  provides for denial of a debtor's discharge if he "knowingly and fraudulently, in or in connection with the case—made a false oath or account."  11 U.S.C. § 727(a)(4)(A).

> [T]he very purpose of … § 727(a)(4)(A) is to [ensure] that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction … Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987).  A party seeking the denial of a discharge pursuant to § 727(a)(4)(A) must establish the following elements: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statements with fraudulent intent; and 5) the statement related materially to the bankruptcy case. Shappell's Inc. v. Perry (In re Perry), 252 B.R. 541, 549 (Bankr. M.D. Fla. 2000).  A false oath may involve a false statement or omission.  Fogal Legware of Switzerland, Inc. v. Wills (In re Wills), 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999).  "There is a difference between a debtor who is trying to hide assets with a false oath or material omissions in his Statement of Financial Affairs, and a debtor who, through inadvertence, mistake, or ignorance … omits certain assets …" In re Dupree, 336 B.R. 520, 527 (Bankr. M.D. Fla. 2005).  In determining whether a debtor has the requisite fraudulent intent, a court should analyze whether omissions or nondisclosures are "part of a scheme … to retain assets for [the debtor's] own benefit at the expense of his creditors." Id.

Plaintiff makes the following allegations concerning the Allstate termination payments, all of which go to the issue of whether Defendant attempted to conceal the termination payments from his creditors: 1) Defendant failed to list the Allstate book of business as a receivable owed to him on Question 16 of the SOFA; 2) Defendant failed to indicate on Question 10 of the SOFA that Allstate acquired his book of business and was paying him approximately $2,190.43 per month for the book of business; 3) Defendant failed to disclose on Schedule I that he is receiving $2,190.43 per month from Allstate to purchase his book of business; and 4) Defendant did not list the Allstate book of business as a liquidated debt owed to him on Item 18 of his Schedule B.  The testimony

established that Defendant informed Mr. Wolfe of the termination payments.  Mr. Wolfe did not know whether to treat the payments as income or an asset.[5]  While he ultimately (and erroneously) failed to include the payments as an asset on Defendant's bankruptcy schedules[6], Mr. Wolfe informed the Trustee of the payments.  Defendant's reliance upon Mr. Wolfe to properly complete his bankruptcy schedules may have been misguided but the Court does not find any evidence of fraudulent intent on the part of Defendant with respect to the Allstate termination payments.

Plaintiff asserts that Defendant fraudulently concealed his interest in Allen Insurance Corporation because he failed to list it as an asset on his Schedule B. However, Defendant did list his interest in Allen Insurance Corporation in response to Item 18 on his SOFA, which requires a debtor to list all businesses with which he was affiliated within the six years preceding the petition.  The Court finds that Defendant did not fraudulently conceal his interest in Allen Insurance Corporation.

Plaintiff asserts that Defendant fraudulently concealed his interest in assets used to operate Allen Insurance.  Plaintiff states "[Defendant] has been in the office for many years.  To suggest the only assets are 3 computers, 3 desks and chairs and a filing cabinet is not credible."   Defendant offered no evidence that Defendant owns any additional business equipment or that the stated value of $300.00 is incorrect.  The Court finds that Defendant did not fraudulently conceal his interest in assets used to operate his business.

---

[5] Insurance renewal commissions which are received post-petition are property of a debtor's bankruptcy estate if all of the actions required to earn the commissions were completed pre-petition.  Wicheff v. Baumgart (In re Wicheff), 215 B.R. 839, 841-42 (B.A.P. 6th Cir. 1998); In re Braddy, 226 B.R. 479, 482-83 (Bankr. N.D. Fla. 1998); Froid v. F.D.I.C. (In re Froid), 109 B.R. 481, 483 (Bankr. M.D. Fla. 1989). Because the termination buyout payments are based on renewal commissions, they are property of the estate.

[6] By extension, Mr. Wolfe failed to list the Allstate book of business as a receivable owed to Defendant on Question 16 of the SOFA, failed to indicate on Question 10 of the SOFA that Allstate had acquired Defendant's book of business and that Defendant was receiving monthly payments of $2,190.43, and failed to list the Allstate book of business as a liquidated debt owed to Defendant on Item 18 of Schedule B.

Plaintiff asserts that Defendant fraudulently concealed the transfer of a 2003 Ford Expedition to his son. Plaintiff points out that the following badges of fraud were present: 1) the transfer was for no consideration; 2) the transfer was to an insider; 3) Defendant was insolvent at the time of the transfer; and 4) Defendant had been sued prior to the transfer. Ordinarily these factors, if present, would create a compelling case that Defendant fraudulently concealed this transfer.[7] However, given Mr. Wolfe's admission that he failed to list the transfer on Defendant's SOFA despite Defendant informing him of the transfer, the foregoing factors do not support a finding of fraudulent intent. The Court finds that Defendant did not fraudulently conceal the transfer of the 2003 Ford Expedition.

Finally, Plaintiff asserts that Defendant fraudulently failed to disclose on his Schedule I that he receives renewal income from non-Allstate customers. As the Court noted, Schedule I requires that a debtor estimate his monthly income of the date of the filing of the form. The amount on Defendant's schedule I included the November, 2014 termination buyout payment and a $198.98 deposit from Southern Fidelity, one of the insurance companies from whom Defendant received renewals. Because the Court is unable to review Defendant's bank statements, other than the Wells Fargo statement, for the month of November, 2014, it is unclear whether Defendant received any additional renewal income for that month. To the extent that the remaining bank statements would evidence additional renewal commissions, the Court finds that Defendant's failure to include that income in the profit and loss statements and the Schedule I was an inadvertent rather than fraudulent failure to disclose the income.

---

[7] The Court makes no finding that all of the factors are present.

13

## **<u>Conclusion</u>**

Claims that a debtor fraudulently undervalued assets, fraudulently failed to disclose pre-petition transfers, or  fraudulently failed to schedule assets should be raised under § 727(a)(4) rather than § 727(a)(2).   Accordingly, the Court will not deny Defendant's discharge pursuant to § 727(a)(2).   Defendant failed to keep adequate books and records from which his financial condition could be ascertained and did not explain or justify such failure under the circumstances of this case.   Therefore, the Court will deny Defendant's discharge pursuant to § 727(a)(3).   Defendant did not fraudulently make a false oath or account in this case.   Accordingly, the Court will not deny Defendant's discharge pursuant to § 727(a)(4).   The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.